# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-1403

_____

| | | |
|---|---|---|
| Caballo Coal Company and Peabody COALSALES Company, | * * * | |
| Appellants, | * * * | Appeal from the United States District Court for the Eastern District of Missouri |
| v. | * | |
| Indiana Michigan Power Company, AEP Energy Services, Inc., and American Electric Power Services Corporation, | * * * * * * | |
| Appellees. | * | |

_____

Submitted: June 11, 2002
Filed: October 2, 2002

_____

Before RILEY, BEAM, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Caballo Coal Company and Peabody COALSALES Company appeal the

district court's[1] denial of a preliminary injunction in this action for breach of a long-term coal supply contract. Because the appellants failed to demonstrate a threat of irreparable harm, the district court is affirmed.

I

Plaintiff/Appellant Caballo Coal Company (Caballo) is a coal producer with mines in Wyoming's Powder River Basin. Plaintiff/Appellant Peabody COALSALES Company is a sales agent for Caballo. Caballo and Peabody COALSALES Company are wholly owned subsidiaries of Peabody Holding Company, Inc., which in turn is a wholly owned subsidiary of Peabody Energy Corporation. The dispute in the present case involves less than 5% of the parent companies' annual Powder River Basin coal production and an even smaller percentage of their total annual coal production.

Defendants/Appellees Indiana Michigan Power Company (IMPC), AEP Energy Services, Inc. (AEP Energy), and American Electric Power Service Corporation (AEP Service) are wholly owned subsidiaries of American Electric Power Company, Inc. IMPC owns and operates a coal fired utility plant in Indiana that has used and uses coal from Caballo. AEP Energy is a coal trader that manages coal procurement for its parent companies' power plants, including the IMPC plant. AEP Energy is not a coal producer and does not presently control any mining operations or coal reserves.

Caballo, as the seller, and IMPC, as the buyer, are the current parties to a forty-year coal supply agreement signed in 1974 by IMPC and a predecessor of Caballo (Agreement). Peabody COALSALES Company and AEP Service, respectively, are Caballo's and IMPC's agents for administration of the Agreement. Under the

_____

[1]The Honorable Charles A. Shaw, United States District Judge for the Eastern District of Missouri.

2

Agreement, the parties have the option to call for a price reopener every five years, i.e., a renegotiation of the base price (Base) under the Agreement for a subsequent five year period. The Agreement provides a structured system to conclude negotiations if the parties fail to agree on a new five year Base. Under the system, Caballo may submit a written offer containing a proposed Base. Following receipt of the written offer, IMPC may procure a competitive offer from another supplier who, under the contract, may be an affiliate of IMPC. If IMPC fails to procure a competitive offer within the time allotted, Caballo's written offer serves as the Base for the subsequent five year period. If IMPC procures a competitive offer, Caballo may match the competitive offer or allow the contract to terminate.[2]

---

[2]Section 8.03 of the Agreement states:

. . . On or before August 1, preceding the end of the then current contract period BUYER will accept SELLER's last offer or obtain and present SELLER with a firm, written offer which it has received from another supplier (including any affiliate or subsidiary of BUYER) which it is willing to accept for the supply of coal called for under the next contract period or under the remaining term of this Agreement (herein referred to as a 'competitive offer'). BUYER shall also provide SELLER with documentary proof of such offer, and permit SELLER to examine all supporting data and information submitted with the offer. A competitive offer, as used in this Article VIII, shall mean an offer of western subbituminous coal which complies with the requirement that when the coal is burned it will not result in stack gas emissions containing more than 1.2 pounds of sulfur dioxide per million Btu heat input.

The competitive offer shall be converted to a delivered cost per million Btu's to BUYER's Cook Terminal located near Metropolis, Illinois. Such 'delivered cost' to BUYER shall consist of the F.O.B. mine price plus all applicable adjustments to a common date plus the least expensive rail transportation rate that BUYER is able to obtain, using its best efforts, for shipping coal from the proposed supplying mine to BUYER's Cook Terminal and plus reasonable railcar costs for such rail

3

In 2001, IMPC requested a price reopener. Prior to renegotiation the Base was $3.262 per ton for 17.5 million tons over five years. Caballo's 2001 written offer was $8.35 per ton. IMPC's affiliate, AEP Energy, received bids from coal producers ranging in price from $7.11 to $8.42 per ton. AEP Energy received bids from other coal traders for smaller quantities ranging in price from $5.26 to $6.21 per ton. All of the coal trader bids were based on prices from the over-the-counter energy market.[3]

shipment. For purposes of calculating the cost per million Btu, the assumed Btu's per pound shall be equal to the Btu's per pound that the proposed supplying mine is capable of supplying. SELLER shall have the option to meet the competitive offer. . . .

If, by September 30, preceding the end of the then current contract period the parties have not reached agreement upon a new Base and SELLER declines to meet a competitive offer submitted by BUYER pursuant to the preceding provisions, this Agreement shall terminate at the end of the then current calendar year, or at BUYER's election, at the end of the temporary continuance of deliveries as provided for in revised Section 8.04.

[3]Plaintiffs assert that the over-the-counter coal market is a relatively new phenomenon that did not exist (at least in its current form) at the time IMPC and Caballo's predecessor entered the Agreement. In general, the over-the-counter coal market is a source for short-term or immediate delivery coal supplies at current prices without pricing premiums to account for long-term risk. Plaintiffs argue that because the price quoted to IMPC by AEP Energy does not include a premium to account for this long-term risk and AEP Energy does not own rights to coal reserves, the AEP Energy offer does not qualify as a competitive offer. Defendants counter that AEP Energy is financially secure and capable of weathering the financial risk attendant to locking itself in as a coal seller subject to the fluctuations of the over-the-counter market. AEP Energy further argues that Caballo unreasonably based its bid on a temporary spike in coal prices that happened to coincide with the price reopener and that AEP Energy's bid–based on forecasts of future over-the-counter market prices–was subsequently shown to be a reasonable forecast. Of course, the price of coal subsequent to the period of price negotiations is irrelevant to the parties' actions

4

Ultimately, AEP Energy offered to sell IMPC 17.5 million tons at $5.60 per ton. IMPC tendered its competitive offer to Caballo based on this $5.60 per ton bid from its affiliate. Caballo did not meet the competitive offer. Instead, Caballo notified IMPC that the competitive offer failed to meet the requirements of the Agreement. Plaintiffs now seek a preliminary injunction and, ultimately, enforcement of the Agreement at the $8.35 per ton Base contained in the written offer.

It is undisputed that AEP Energy's bid was based on a forecast of future over-the-counter coal prices rather than any one underlying bid from a single, guaranteed source. Plaintiffs assert that AEP Energy's bid is a "sham" because without ownership of coal reserves, production capacity or commitments, AEP Energy cannot guarantee delivery of the 17.5 million tons of coal to IMPC. Plaintiffs argue specifically that the IMPC offer based on the AEP Energy bid is not a qualifying competitive offer because: (1) the IMPC offer fails to specify a single "proposed supplying mine" and instead specifies the Powder River Basin as a source; (2) AEP Energy is not a coal producer and, therefore, not "another supplier" as required under the Agreement; (3) AEP Energy based its price on forecast models that utilized short-term, small quantity, over-the-counter market prices rather than long-term, guaranteed-supply prices; and (4) AEP Energy is not independent of IMPC.

Defendants assert that IMPC's competitive offer satisfied all of the express terms of the Agreement and that Caballo's failure to match the competitive offer caused the contract to terminate. Specifically, Defendants note that the competitive offer was (1) firm; (2) written; (3) made by a supplier; (4) from an affiliate; (5) for western subbituminous coal which, when burned, will not result in stack gas emissions containing more than 1.2 pounds of sulfur dioxide per million Btu head input; and (6) converted to a delivered cost per million Btus to IMPC's Cook

_____

at the time of price renegotiation, but it does help to explain the disparity between the AEP Energy and Caballo bids.

5

Terminal.  See Agreement Section 8.03, infra at fn. 2.  Finally, Defendants argue that the additional requirements urged by Caballo are not a part of the Agreement.

III

The district courts have broad discretion in ruling on requests for preliminary injunctions.  Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 n.8 (8th Cir. 1981) (en banc) (collecting cases).  Accordingly, we review a district court's refusal to grant a preliminary injunction for abuse of that discretion.  United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1179 (8th Cir. 1998) ("A district court has broad discretion when ruling on requests for preliminary injunctions, and we will reverse only for clearly erroneous factual determinations, an error of law, or an abuse of that discretion.").

In Dataphase, the Eighth Circuit identified four factors to guide the analysis of preliminary injunction requests: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." Dataphase, 640 F.2d at 114.  The Dataphase court noted that a failure to demonstrate irreparable harm, standing alone, may be a sufficient basis to deny preliminary injunctive relief. Id. at 114 n.9 (vacating a preliminary injunction where a district court had not found irreparable harm and stating that "the absence of a finding of irreparable injury is alone sufficient ground for vacating the preliminary injunction.").  Following Dataphase, this court has repeatedly emphasized the importance of a showing of irreparable harm. See Adam-Mellang v. Apartment Search, Inc., 96 F.3d 297, 299 (8th Cir. 1996) (quoting Beacon Theatres, Inc., v. Westover, 359 U.S. 500, 506-07 (1959) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.")); Bandag, Inc. v. Jack's Tire & Oil, Inc., 190 F.3d 924, 926 (8th Cir. 1999) (same).

6

The district court denied Plaintiffs' request for a preliminary injunction relying primarily on Plaintiffs' failure to demonstrate a threat of irreparable harm. In doing so, the district court stated:

> According to the record, Caballo and Peabody can and have calculated monetary damages for the next five-year contract period, should they prevail on the merits. In addition, according to the testimony of Paul Vining, Peabody will be able to sell the Caballo coal covered by the Agreement during that period. The Court agrees with defendants, if plaintiffs decide to pursue this litigation, the case will definitely be decided, finally and conclusively, well within the next five years. If plaintiffs should prevail, then the Court will render plaintiffs appropriate relief. This case does not involve plaintiffs' inability to sell its product to other companies. Plaintiffs testified that the market for this particular type of coal is strong and growing, and that it can sell the coal in that growing market. Moreover, the testimony of Paul Vining and Richard Whiting, plaintiffs' witnesses, revealed that neither Caballo nor any of the Peabody entities are threatened as viable businesses if the Court does not enter the requested preliminary injunction. The amount of the contract is only 3.5% of Peabody's [Powder River Basin] coal output and less than 2% of Peabody's overall coal production.

Caballo Coal Co. and Peabody COALSALES v. Indiana Michigan Power Company, AEP Energy Services, Inc., and American Electric Power Services Corporation, No. 01-1558 (E.D. Mo. filed Jan. 10, 2002) (order denying preliminary injunction). In their effort to demonstrate a threat of irreparable harm, Plaintiffs emphasized the uncertainty surrounding future coal prices, the availability of specific performance as a final remedy, and the possible disruption of Caballo's mining operations. The district court correctly determined that the record belies Plaintiffs' arguments. The record reflects that the market for coal from the Powder River Basin is growing and that Caballo will be able to sell the coal intended for IMPC (albeit at a price likely to fall short of $8.35 per ton). As a result, if Plaintiffs do prevail at trial, it will be a simple matter to calculate interim damages. Plaintiffs admit that an appropriate

7

measure of interim damages in this contract action will be the difference between the contract price and the actual sale price.[4] In fact, the record reflects that Plaintiffs have already calculated such damages. Accordingly, although the calculation of *future* damages may be uncertain following resolution of the present litigation (due to the uncertainty of future coal prices) and specific performance may be an appropriate means to address *future* harm, the calculation of interim damages will not be uncertain. As this court stated in <u>Bandag</u>, "any harm [the movant] sustains between now and . . . trial will adequately be compensated by an award of damages and permanent injunction." <u>Bandag</u>, 190 F.3d at 926.

This conclusion is buttressed by the testimony of Plaintiffs' own witnesses who stated the coal under the Agreement comprises only 3.5% of the parent companies' Powder River Basin production and less than 2% of their overall production. These witnesses also stated that Plaintiffs' financial viability will not be jeopardized in the absence of a preliminary injunction. In light of this testimony, we are not convinced that Caballo's mining enterprise will be irreparably disrupted without a preliminary injunction. Accordingly, because any interim harm is compensable by a monetary award, the district court's decision involved no clear error and was not an abuse of discretion.

Further, the balance of harm factor under <u>Dataphase</u> does not serve to significantly favor either party. Both companies face financial risk by continuing the

---

[4]In their brief, Plaintiffs state, ". . . if Defendants were ultimately to prevail at trial, IMPC could easily be compensated for any damages caused by the preliminary injunction by ordering Caballo to refund to IMPC the difference, if any, between the $8.35 Base and the spot market prices that IMPC could have paid for coal while the preliminary injunction was in effect." However, Plaintiffs failed to demonstrate why a similar calculation would not result in adequate compensation to Plaintiffs if no injunction issues, Caballo sells its coal for less than $8.35 and IMPC is ultimately forced to honor the Agreement at $8.35 per ton.

8

present litigation. However, the record reflects that both companies will weather this potential harm without facing financial ruin. Where the potential harm to both parties is purely monetary, albeit substantial, and where neither party's financial viability is threatened, the court need not conduct a precise accounting to determine that the balance of harm factor does not demand injunctive relief.

Similarly, the public policy factor does not demand a grant of injunctive relief. Although the present case touches upon public policy issues concerning the structure of energy markets, the matter actually before the court is a contract dispute among private litigants. Public interest does not weigh heavily in such a case, especially where there has been no demonstration that a party's existence or financial viability is threatened or that the supply of energy to end users is in jeopardy.

Finally, the court need not indulge in a detailed discussion of Plaintiffs' likelihood of success. Any likelihood of success by Plaintiffs is not so convincingly strong as to outweigh the absence of irreparable harm or the other Dataphase factors. It is important to note that in this instance, as in any preliminary injunction analysis, the court does not predetermine the merits of the case. O'Connor v. Peru State College, 728 F.2d 1001, 1002-03 (8th Cir. 1984) ("The proceedings are at an early stage and to prejudge the evidence before it is fully collated and demonstrated is basically unfair. Under these circumstances, the court should avoid deciding with any degree of certainty who will succeed or not succeed.")

The district court's denial of a preliminary injunction is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT

9